**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

**Bankruptcy No. 85–01307–R.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Aug. 25, 1986.

See also, Bkrtcy., 59 B.R. 99.

Leonard M. Rosen, Lawrence P. King, Harold S. Novikoff and Amy R. Wolf, Wachtell, Lipton, Rosen & Katz, New York City, and M. Caldwell Butler, Woods, Rogers & Hazlegrove, Roanoke, Va., James F. Douthat, and John Jessey, for Official Unsecured Creditors Committee.

Murray Drabkin, Cadwalader, Wickersham & Taft, Washington, D.C., Mark Ellenberg, George B. Little, Lawrence B. Cann, III, Little, Parsley & Cluverius, Richmond, Va., for Committee of Representatives of Dalkon Shield Claimants.

Richard M. Wexwell, Fairfax, Va., Bradley Post, Douglas Bragg, Robert Mancahster, Neal Rossman and Judith Rentschler, for Certain MDL 211 Claimants.

Robert M. Miller and James N. Nolan, Bishop, Liberman & Cook, New York City, for Share Holders Committee.

Stanley K. Joynes, III, Rilee, Cantor, Arkema & Edmonds, Richmond, Va., for Future Tort Claimants.

William R. Cogar, Mays, Valentine, Davenport & Moore, Richmond, Va., Michael L. Cook and Dennis J. Drebsky, Skadden, Arps, Slate, Meagher & Flom, New York City, Penn Ayers Butler, Murphy, Weir & Butler, San Francisco, Cal., for A.H. Robins.

William C. White, Alexandria, Va., U.S. Trustee.

S. David Schiller, Asst. U.S. Atty., Richmond, Va., for U.S.

Robert M. Miller, David A. Strumwasser, James M. Nolan, Bishop, Liberman & Cook, New York City, Ross C. Reeves, Willcox & Savage, P.C., Norfolk, Va., for Official Committee of Equity Sec. Holders.

W. Scott Street, Williams, Mullen & Christian, Richmond, Va., for Aetna Cas. and Sur. Co.

Stephen H. Fredkin and Stan L. Linker, Salinas, Cal., and Samuel M. Walker, Jr., Coates & Comess, Richmond, Va., for Rebecca Grady.

## MEMORANDUM

ROBERT R. MERHIGE, Jr., District Judge.

This matter comes before the Court on motion of Rebecca Grady ("Grady") for a declaration by the Court that her claim against A.H. Robins Company, Incorporated (the "Debtor," the "Company," "Robins"), is a post-petition claim which is to be paid as an administrative expense of this proceeding. Grady filed suit against Robins in the United States District Court for the Northern District of California[1] for injuries she allegedly suffered from as a result of her wearing the Dalkon Shield intrauterine device ("Dalkon Shield," "IUD"). She contends that to proceed with the prosecution of her complaint would not offend the automatic stay provisions of 11 U.S.C. § 362(a)(1).

The issue has been thoroughly briefed and argued by all interested parties[2] and is ripe for disposition.

### 1. *Factual Background*

#### a. *Robins*

Robins, a sizeable world-wide "pharmaceutical" company, was the manufacturer, distributor, and seller of the Dalkon Shield from approximately 1970 to 1976. The Dalkon Shield has been the source of an incredible amount of litigation over the years; women have filed numerous lawsuits against the Company alleging that the Dalkon Shield caused them to suffer from injuries as serious as ectopic pregnancy, uterine embedment or perforation, and pelvic inflammatory disease. The spiraling debt which Robins faced, from the settlement of cases as well as legal fees and costs arising out of the lawsuits, became, so Robins contends, insurmountable. By August 21, 1985, the Company decided that its only option, if it were to remain a viable entity, was to file a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

#### b. *Grady*

For purposes of addressing the instant issue, the Court accepts as accurate Grady's recitation of the facts supporting her claim against the Company. Those facts reveal the following:

Grady had been inserted with a Dalkon Shield, but thought it had fallen out some years before her admission to a hospital in California.[3] Approximately four days prior to the Company's filing Chapter 11, Grady began experiencing abdominal pain, fever and chills, but she did not go to a hospital for treatment until August 21, 1985, the date Robins filed its petition for relief.[4] Her doctors did not discover the presence of the Dalkon Shield until August 28, 1985, seven (7) days after the Company filed its

---

1. Grady's lawsuit in United States District Court for the Northern District of California is styled *Rebecca Grady v. A.H. Robins Company, Inc.,* Action No. 85–20635 SW.

2. A brief in support of the motion was filed by Grady and the Legal Representative for Future Tort Claimants (Futures Representative). Briefs in Opposition to the motion were filed by the Official Unsecured Creditors' Committee, A.H. Robins Company, Incorporated, Committee of Dalkon Shield Claimants, and the Official Committee of Equity Security Holders. Supplemental briefs were filed by Grady and the Legal Representative for Future Tort Claimants.

3. Grady Affidavit, ¶ 4.

4. Grady Affidavit, ¶ 3.

petition for relief.[5] Once the Dalkon Shield was discovered, the doctors operated, and it was removed.[6]

### 2. Merits

Grady argues that her claim arose post-petition; hence, it is her contention that the automatic stay does not prohibit her from proceeding with her lawsuit against the Company.[7] Grady's position is that her claim, for federal bankruptcy purposes, arose at the same time her cause of action accrued for state law purposes. Since it is Grady's position that California law applies to her suit, she argues that because her cause of action did not arise until the time she knew or should have known the cause of her injury, she has a post-petition claim. The Court disagrees.

### a. The Applicability of the Automatic Stay, 11 U.S.C. § 362(a)(1).

The issues arising from the pending motion involve the interplay of two separate, yet crucially interwoven provisions of the Bankruptcy Code, 11 U.S.C. § 362(a)(1), and 11 U.S.C. § 101(4)(A). Section 362 covers the automatic stay and section 101(4)(A) defines the scope of a "claim"

Section 362(a)(1) provides in pertinent part:

Except as otherwise provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78 eee(a)(3)), operates as a stay, applicable to all entities of —

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the

case under this title, or to recover *a claim against the debtor that arose before the commencement of the case under this title.*

11 U.S.C. § 362(a)(1)(emphasis added).

■ The automatic stay is a self-executing provision of the Bankruptcy Code and begins to operate nationwide, without notice, once the debtor files its petition for relief. *See In re Johns-Manville Corp.*, 57 B.R. 680, 686 (Bankr.S.D.N.Y.1986). It is "one of the fundamental debtor protections provided by the bankruptcy laws," *In re Johns-Manville Corp., supra,* 57 B.R. at 685, *citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* U.S.Code Cong. & Ad.News 5787, 5963, 6296; S.Rep. No. 989, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5840, "particularly for debtors in reorganization proceedings under Chapter 11." *Matter of Baldwin-United Corp.*, 48 B.R. 901, 902 (Bankr.S.D.Ohio 1985). It is, as the United States Court of Appeals for the Second Circuit explained, "designed to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1976). *See also In re Frigitemp Corp.*, 8 B.R. 284, 289 (Bankr.S.D.N.Y.1981) (holding that "[t]he federal policy underlying the stay is the protection of the debtor's estate from the chaos and the wasteful depletion resulting from multifold, uncoordinated and possibly conflicting litigation.") What the automatic stay provides is "the essential breathing room for a Chapter 11 debtor to restructure its affairs with its creditors and reorganize into a viable entity. Its importance increases exponentially in cases the magnitude of these Chapter 11s." *Matter of Baldwin, supra,* 48 B.R. at 902.

---

**5.** Grady Affidavit, ¶¶ 3, 5.

**6.** Grady Affidavit, ¶ 6.

**7.** The United States District Court for the Northern District of California transferred Grady's suit to this Court's; *see Grady v. Robins,* CA 86–303.

The parties do not contest the operation of the automatic stay in this proceeding, though all agree that its power is not omnipotent.[8] Section 362(a)(1) authorizes the stay to extend to either a *cause of action* which could have been commenced pre-petition or to a *claim* which arose pre-petition. Thus, the court's determination of whether Grady could have proceeded with her lawsuit before the petition was filed or whether she had a claim against the Debtor which arose pre-petition will be the finding which renders the automatic stay either applicable or inapplicable to Grady's lawsuit.

Assuming California law were applicable to Grady's claim, she could not have filed her case pre-petition. California law provides that "actions based on progressively developing or continuing wrongs where the nature, extent, or permanence of the harm are difficult to discover, do not accrue until the injured party knows or should have known of the cause of injury." *Warrington v. Charles Pfizer & Co.*, 274 Cal. App.2d 564, 567, 80 Cal.Rptr. 130 (1969). Assuming that Grady did not become aware of the cause of her injury until her operation on August 28, 1985, the Court could not find, at this stage of the proceeding,[9] that Grady's suit could have been filed pre-petition. Thus, the critical issue in this motion becomes whether Grady has a claim which arose pre-petition; if she did, the automatic stay would apply.

### b. *Does Grady Have a Claim Which is Applicable to the Automatic Stay?*

"Claim" is broadly defined in the Bankruptcy Code, and provides for a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4)(A).

This broad definition of claim is an intentional departure from the "provability" and "allowability" concepts promulgated under the old Bankruptcy Act.[10] The old Act required that a debt be "provable" in order for it to be dischargeable, and thus, if a debt were remote, i.e. it could not be estimated or liquidated, it could not be discharged by the debtor's estate. What all too frequently resulted was a debtor, fresh out of a reorganization proceeding, who was precluded from successfully reorganizing because there were too many non-"provable" debts outstanding after its plan of reorganization had been confirmed.

The legislative history of the Code supports a broad definition of the term "claim." It states:

> The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured ... By this broadest possible definition

---

8. There are exceptions to the automatic stay provided in 11 U.S.C. § 362(b). The Court can also grant a party in interest relief from the stay pursuant to 11 U.S.C. § 362(d). These exceptions, however, are inapplicable to the instant case. Likewise, Grady has not asked relief from the stay under § 362(d). Instead, Grady argues that the stay does not apply to her claim since her cause of action arose post-petition.

9. The statute of limitations which will be applicable to all Dalkon Shield claimants is still an outstanding and unresolved issue for the Court.

10. The Bankruptcy Act of 1898 ("Act") did not specifically define a "claim," although § 63 of the Act provided that certain debts could be 'proved and allowed against [the] estate.' A debt was specifically defined in § 1(14) of the Act to 'include any debt, demand, or claim prov-

able in bankruptcy.' The act thus required an initial determination of the claim's provability. Section 63(a) interlocked with § 57(d) of the Act which provided:

> [c]laims which have been duly proved shall be allowed upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: Provided, however, that an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this title.

and by the use of the term throughout the Title 11, especially in subchapter I of Chapter 5, the Bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the Bankruptcy Court.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6266; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08.

The courts, following the legislators' intent, have interpreted the term "claim" liberally. For example, courts have found that a "claim" under the Bankruptcy Code is:

> inter alia, "broad," *Ohio v. Kovacs*, 53 U.S.L.W. 4068 [469 U.S. 274], 105 S.Ct. 705, 709 [83 L.Ed.2d 649] (1985); "very broad." *In re M. Frenville Co., Inc.*, 744 F.2d 332, 336 (3d Cir.1984). cert. denied 105 S.Ct. 911 [83 L.Ed.2d 925] (1985); "extremely broad." *In re Kennise Diversified Corp.* 34 B.R. 237, 244 n. 6 (Bankr.S.D.N.Y.1983); "could not be broader," *In re Thomas*, 12 B.R. 432, 433 (Bankr.S.D.Iowa 1981); "broadest possible," *Kallen v. Litas*, 47 B.R. 977, 982 (N.D.Ill.1985); *In re Vasu Fabrics, Inc.*, 39 B.R. 513, 517 (Bankr.S.D.N.Y.1984); *In re Johns-Manville Corp.*, 36 B.R. 743, 754 n. 6 (Bankr.S.D.N.Y.1984); "all-encompassing," *In re Baldwin-United Corp.*, 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985); *In re Barnett*, 42 B.R. 254, 257 (Bankr.S.D.N.Y.1984); and "sufficiently broad to cover any possible obligation," *In re Smith Jones, Inc.*, 26 B.R. 289, 293 (Bankr.D.Minn.1982).

*In re Robinson*, 776 F.2d 30, 35 (2d. Cir. 1985).

Despite the inherently broad definition of the term "claim," the parties disagree over whether its definition would include Grady's lawsuit in the instant motion.

The Futures Representative argues that when determining whether a claim exists, the crucial inquiry is first, whether a right to payment exists, and second, whether the right thus identified is one of those described by the adjectives enumerated in the definition of claim.[11] The Futures Representative contends that since Grady did not, at the time the petition was filed, have a right of payment from Robins, then it was not legally obliged to her at the time it filed Chapter 11, and she does not, therefore, have a claim subject to the automatic stay.

The Unsecured Creditors Committee argues that the determination of "whether a claim against a debtor is pre- or post-petition can be made by analyzing when the conduct of the debtor upon which the claim is based occurred or, in other words, whether it was conduct of the pre-petition debtor or conduct of the post-petition debtor in possession or trustee."[12] The Unsecured Committee argues that since Grady was inserted with the allegedly defective product prior to the Debtor's filing its petition, the claim is pre-petition and must be stayed pursuant to § 362(a)(1).

The Court concurs with this conclusion.

The Futures Representative argues that the leading authority on the definition of a claim is *Matter of M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir.1984). However, the court disagrees with the Futures Representative and the degree of authority he attributes to the *Frenville* opinion. This Court respectfully finds the holding in *Frenville* questionable, and one which has been highly criticized.[13] The invitation to embrace the *Frenville* error is respectfully declined.

---

11. Futures Representative's Brief, p. 4.

12. Unsecured Creditor's Committee Brief, p.5.

13. *See Johns-Manville, supra*, 57 B.R. at 688 (holding that "[n]ot only are the facts of this [*Johns-Manville*] case distinguishable from those in *Frenville*, but *Frenville* with a strained, narrow analysis limits by judicial fiat a broad,

legislatively-mandated definition of the term 'claim' "); *In re Baldwin-United Corp.*, 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985) (holding that the *Frenville* decision is

.... fundamentally at odds with applicable precedents from the Sixth Circuit, and respectfully decline to follow it. Our disagreement with that decision flows from the

Prior to its assuming the position of a Chapter 7 debtor, Frenville, an independent auditor, employed an accounting firm to prepare its financial statements. After Frenville filed its petition for relief, a number of banks who had received these financial statements filed suit against the accounting firm alleging that the statements were negligently and recklessly prepared. The accounting firm, seeking indemnification from Frenville moved for relief from the automatic stay so that they could implead Frenville in the lawsuit pending against them. *Frenville, supra,* 744 F.2d at 333.

The *Frenville* case is similar to the instant case to the extent that in both, the acts of the debtor giving rise to the action against it occurred pre-petition, yet the actual filing of the cause of action did not arise until post-petition. The *Frenville* court, faced with these facts, framed its task accordingly:

> Is the automatic stay of 362(a) of the Code applicable when the debtor's acts which form the basis of a suit occurred pre-petition but the actual cause of action which is being instituted did not arise until after the filing of the bankruptcy petition?

*Frenville, supra* 744 F.2d at 334.

Although the *Frenville* court was aware that the term "claim" was defined broadly,

Court's failure to distinguish between "claim" as defined in 11 U.S.C. § 101(4) and a cause of action for indemnity or contribution under state law. While the Third Circuit acknowledges the all-encompassing definition of "claim" under § 101(4), it nonetheless holds that the claim for indemnity or contribution arose at the same time that a cause of action arose.)

*See also In re Yanks,* 49 B.R. 56, 58 (Bankr. 1985) (holding that "[t]his Court, after careful consideration, respectfully elects not to follow the *Frenville* decision.")

**14.** In *In re Yanks, supra,* 49 B.R. at 58, the court found *Frenville's* reliance on *Vanston, supra,* 329 U.S. at 161, 67 S.Ct. at 239, misplaced. *Yanks* found that "[t]he holding of that case is that federal case law under the Bankruptcy Act and developed in federal equity receiverships prohibited the allowance of a claim which was valid and enforceable under state law. That holding does not support *Frenville's* reliance

the court held, in any event, that the threshold determination of whether a claim existed depended on if there was a "right to payment." *Frenville, supra* 744 F.2d at 336. Recognizing that the Code did not define "right to payment," *Frenville* held that "while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" *Frenville,* 744 F.2d at 337 *citing Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946).[14]

The *Frenville* court did not find any overriding federal law in its case, and therefore applied New York law to determine when the right to payment arose. In its application of New York law, the court held that a claim for contribution or indemnification did not accrue until the time of the payment of the judgment flowing from the act. *Frenville, supra* 744 F.2d at 337. Because the accounting firm did not have a claim until after the banks instituted suit, the Court found the claim to be post-petition.

Although *Frenville* applied state law to determine whether a claim existed, it did note that:

> "[i]f there were some overriding federal policy, we might have the power to devel-

upon state law to determine if a claim existed against the debtors at the time the bankruptcy cases were commenced." Furthermore, the *Yanks* court found the *Frenville* decision inconsistent with the recent Supreme Court opinion, *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). The *Yanks* court, interpreting *Kovacs,* held that

… the Supreme Court followed Congressional intent by applying a broad definition of "claim" and held that a state's injunction against an individual debtor had become an obligation to pay money, a claim dischargeable in bankruptcy. The Court's inquiry focused on the definition of "claim" in the Bankruptcy Code and its legislative history. Not once did the Supreme Court find it necessary to consider state law to determine whether there was a "claim" or right of payment. *Yanks, supra* 49 B.R. at 58.

op federal law. *See In re Beck Industries, Inc.*, 725 F.2d 880, 891 (2d Cir. 1984); *In re Johns-Manville Corp.*, 36 B.R. 743, 751 n. 4 (Bankr.S.D.N.Y.), *appeal denied*, 39 B.R. 234 (S.D.N.Y.1984). A bankruptcy proceeding stemming from a mass tort—such as exposure to asbestos—may be a case in which the application of federal law is indicated."

*Frenville, supra* 744 F.2d at 337 n. 8.

Along these same lines, Judge Lifland in *Johns-Manville*, noted that:

Reference to state law, even if possible and accurate, may produce a conflict with overriding policies of federal law. Under the Bankruptcy Code, if state law notions so narrow the definition of a 'claim' as to frustrate the stated objective of providing the debtor the broadest possible relief, state law must yield to an overriding federal construction.

*Johns-Manville*, 36 B.R. at 755 n. 6.

Robins represents the type of case both Judge Lifland and Judge Adams envisioned when they constructed these two oftcited footnotes. Robins filed its petition for relief in an effort to survive the massive liabilities arising out of the Dalkon Shield. If federal law were not created in this case, Robins could be subject to an ongoing battle with Dalkon Shield cases and would have to defend piece-meal litigation, which technically, if allowed, could be interpreted to fall outside the reorganization umbrella. This is just the type of chaos the drafters of the Code sought to avoid when they abandoned the concept of "provability" and "allowability" which was rooted in old Act, and adopted, in its place, the more broad, and liberal definition of the term "claim" as presently found in the Code.

To follow *Frenville* and apply state law would be to confuse a "right to payment" for federal bankruptcy purposes with the accrual of a cause of action for state law purposes. As the *Edge* court noted, "[t]he statute of limitations cases do not concern the same issues or the same principles [as

those which arise under the Code and a determination of when a claim arises]." *In re Edge*, 60 B.R. 690, 699 (Bankr.M.D.Tenn. 1986). *Edge* further explained that just because "the Tennessee Legislature would limit access to the courts for redress of a wrong does not illuminate when the underlying right of redress became cognizable for bankruptcy purposes." *Edge, supra* 60 B.R. at 699.

■ This Court will not sanction a state's statute of limitations as controlling either the existence or non-existence of a "claim" under the Bankruptcy Code. As the *Johns-Manville* court commented, "[i]t creates an artificial and arbitrary classification system by which the timing of the lawsuit against the claimant determines not only the priority of the distribution on a claim, but also the dischargeability of the claim." *Johns-Manville, supra* 57 B.R. at 689. *Johns-Manville* further recognized that if a statute of limitations analysis were followed "parties could artificially juggle their existing substantive rights by deciding for themselves the best time to serve process." *Johns-Manville, supra* 57 B.R. at 689.

Furthermore, the statutory construction of § 362(a)(1) would be frustrated if the statute of limitations analysis were left to control the issue. The automatic stay of § 362(a)(1) was promulgated as a safeguard for the debtor's estate so that a plan of reorganization could be submitted and eventually confirmed. *See* text *infra* at 3–4. In its carefully constructed language, the statute precludes a creditor from pursuing his or her claim if his or her suit could have been filed pre-petition *or* if his or her claim arose pre-petition. Obviously, whether a creditor's suit could have been commenced pre-petition implicates an analysis of the statute of limitations; the drafters of the Code, with their use of the disjunctive *or*, could not have envisioned a similar analysis in their determination of when a claim would arise. The two concepts invoke separate analyses.

The Court finds the opinion of Bankruptcy Judge Lundin in *In re Edge, supra* 60 B.R. at 699 more persuasive in its disposition of this aspect of the case than it does that of the Third Circuit's, as expressed in *Frenville.*

In *Edge,* the court was faced with a plaintiff who wanted to sue two Chapter 7 debtors for negligent dental treatment which had occurred as a result of the debtors' pre-petition conduct, but whose injuries did not surface until post-petition. The court, rejecting *Frenville* and its application of state law to determine when a right to payment arose, held that:

> I believe that the 1978 Bankruptcy Code recognizes a 'right of payment' for the victim of a debtor's prepetition conduct at the earliest point in the relationship between victim and wrongdoer. Though this right to payment may not be manifested as a right of access to other courts and though it be unmatured and contingent, it is a charge upon the wrongdoer and a demand inherent in the victim from the moment of the wrongful act.

*Edge, supra* 60 B.R. at 699.

■ The *Edge* court, understandably concerned that an application of state law would frustrate the goals of the Bankruptcy Code, found that "overriding federal policies" substantiated its conclusion favoring: (1) compensation for hurt people, (2) providing a fresh start for the debtor, and (3) equitably distributing the debtor's assets. Accordingly, *Edge* found that a "right to payment for a victim of a debtor's prepetition misconduct arises at the earliest point in the relationship between victim and wrongdoer." *Edge, supra* 60 B.R. at 699.

Although the *Edge* court found it necessary to hold that a "right to payment" arises at the earliest point in the relationship between the victim and wrongdoer, this Court finds that such a sweeping definition is not necessary to further the policies underlying the Code. In determining the appropriate definition of a "right to payment" the Court, in its desire to further the policies of the Code, finds the definition as expressed in *Johns-Manville,* more appropriate and well-tailored to its needs.

■ In *Johns-Manville,* the court was faced with two third-party actions which were filed against Manville post-petition. The court, rejecting the holding in *Frenville,* concluded that a "right to payment" arises at the "time when the acts giving rise to the alleged liability were performed." *Johns-Manville, supra* 57 B.R. at 690. This definition if adopted in the instant case, would support most equitably the Code, and its policies of compensating creditors, allowing a debtor an opportunity to reorganize, and providing an equitable distribution of the debtor's estate. Accordingly, it is this Court's position that a "right to payment" arises at the "time when the acts giving rise to the alleged liability were performed." *Johns-Manville, supra* 57 B.R. at 690. Applying this definition to the Robins case, the Court finds that the "right to payment" arises at the time the Dalkon Shield claimant, and more specifically for this motion, Grady, was inserted with the Dalkon Shield.[15]

The Bankruptcy Code seeks to provide a system whereby creditors will be compensated, a debtor will be allowed a fresh start and an opportunity to reorganize, and creditors will be subject to an equitable distribution of the debtor's assets. These policy concerns, as highlighted in *Edge* and *Johns-Manville,* are equally important to the instant case.

If the contentions urged by Grady and the Futures Representative were accepted,

15. The Court's finding that the time at which plaintiff was inserted with the Dalkon Shield is the point at which a "right to payment" arises should not be confused with any issues which might later arise as a result of a statute of limitations analysis, presently under advisement by the court. This Court's holding is narrowly tailored to resolve the issue of what constitutes a "claim" under the Code, and should not be construed as anything more.

it is reasonable to assume that Robins would continue to be subjected to a continuous flow of piece-meal litigation arising out of the Dalkon Shield. Such a situation could, if permitted, render the efforts now being, and which will continue to be expended to fulfill the promise and intent of Congress in enacting Chapter 11, meaningless. This Court, in the absence of authority mandating such a scenario, will not participate in an obviously futile "Catch 22" exercise. This result would clearly "upset Congress' intent to channel claims concerns toward one forum and allow for a comprehensive plan of reorganization." *Johns-Manville, supra* 57 B.R. at 690. Furthermore, it would "reinstate the 'provability' concept of claims which the drafters of the Code specifically intended to abolish." *Johns-Manville, supra* 57 B.R. at 690.

Additionally, the position forwarded by Grady and the Futures Representative is patently unfair to the Dalkon Shield claimants. Simply because a woman who has been injured by the Dalkon Shield has a claim, according to state law analysis, which might arise pre-petition, her means of recovery should not be any different from that of a woman whose claim, according to state law analysis, arises post-petition. It would be unfair to allow the timing of a woman's claim to be the factor which determines whether her remedy is based on the distribution of the debtor's assets arising out of a plan of reorganization or the more broadbased remedies arising out of federal civil procedure and its practices.

Finally, though it might seem more advantageous for a woman to seek a post-petition status and pursue her federal civil remedies, her status unquestionably puts her claim at risk. More specifically, if the debtor were to file Chapter 7 and be in a position of having to liquidate its assets, post-petition claimants would fall outside the bankruptcy umbrella and thus be precluded from sharing in the debtor's estate.[16] A liquidated corporation would be of no assistance to one whose claim arose subsequent to any such liquidation.

This case mandates the application of federal law if the federal policies underlying the Bankruptcy Code are to be furthered. The technical reading of the phrase "right to payment," which has been supported by Grady and the Futures Representative would frustrate the purposes of Chapter 11. This Court must, and will, promote the true intent of the drafters of the Code when it promulgated the term "claim." Accordingly, this Court concludes that women, who were allegedly injured by the Dalkon Shield, have a "right to payment" which arises when the acts giving rise to the alleged liability were performed.[17]

*Conclusion*

For the reasons stated in this memorandum, the Court concludes that Grady's lawsuit represents a pre-petition claim and is therefore stayed pursuant to the mandates of § 362(a)(1).

An appropriate order shall issue.

---

**16.** It is unnecessary for the court to determine at this time whether a post-petition claim arising from the Dalkon Shield would constitute an administrative expense under 11 U.S.C. § 503(b)(1)(A).

**17.** The Court's holding does not address whether the future claimants will have a dischargeable claim in this reorganization. Whether or not a future's claimant will be afforded relief in this bankruptcy will be determined when the issue is ripe for disposition.